No. 24-10714-J

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

BRADLY GIBSON, *ET AL.*,

*Appellant / Cross-Appellee,*

vs.

OUTOKUMPU STAINLESS USA, LLC,

*Appellee / Cross-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF ALABAMA

No. 1:21-cv-00103-JB-N

**APPELLANT'S / CROSS-APPELLEE'S OPENING BRIEF**

Ian D. Rosenthal
Davis, Davis & Associates
27180 Pollard Road
Daphne, Alabama 36526
(251) 621-1555

Patrick H. Sims
Sims Law Firm, LLC
P.O. Box 7112
Mobile, AL 36670
(251) 490-9424

Frederick G. Helmsing, Jr.
McDowell Knight Roedder & Sledge, LLC
1 North Water Street, Suite 13290
Mobile, Alabama 36602
(251) 432-5300

ATTORNEYS FOR APPELLANT / CROSS-APPELLEE BRADLY
GIBSON

No. 24-10714-J

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

BRADLY GIBSON, *ET AL.*,

*Appellant / Cross-Appellee,*

vs.

OUTOKUMPU STAINLESS USA, LLC,

*Appellee / Cross-Appellant.*

## APPELLANT'S / CROSS-APPELLEE'S CERTIFICATE OF INTERESTED PERSONS

Counsel of record for Appellant / Cross-Appellee Bradly Gibson certify that the following persons may have an interest in the outcome of this appeal. Gibson makes these representations for the Judges of this Court to evaluate possible disqualification or recusal:

Beaverstock, Hon. Jeffrey U.

Bivins, Hon. Sonja F.

Burr & Forman LLP

Davis, Davis and Associates

Dolive, Esq., Devin C.

Flowers, Jr., Esq., Ronald W.

Gatlin, Esq., Cheri Turnage

C-1

Gibson, Bradly

Helmsing, Jr., Esq., Frederick George

McDowell Knight Roedder & Sledge, L.L.C.

Nelson, Hon. Katherine P.

Outokumpu Americas, Inc.

Outokumpu Holding Nederland BV

Outokumpu Oyj (OUT1V:HEL)[1]

Outokumpu Stainless USA, LLC

Rosenthal, Esq., Ian David

Sims Law Firm, LLC

Sims, Esq. Patrick H.

Solidium Oy

Wasden, Esq. H. William

/s/ Ian D. Rosenthal
Ian D. Rosenthal

One of the Attorneys for Appellant /
Cross-Appellee Bradly Gibson

---

[1] Solidium Oy, a Finnish state owned investment company, holds more than 10% of Outokumpu Oyj's stock.

Ian D. Rosenthal
Davis, Davis & Associates
27180 Pollard Road
Daphne, Alabama 36526
(251) 621-1555
ian@ddalawfirm.com

## **Statement Regarding Oral Argument**

Oral argument is requested. While the core issue might be fairly decided based on the absence of evidence in the record to support the underlying verdict, the decisional process of this Court may be significantly aided by oral argument. See Fed. R. App. P. 34(a)(2); 11th Cir. R. 34-3(b)

# Table of Contents

**Page**

Statement Regarding Oral Argument ........................................................i

Table of Citations ...................................................................................iii

I.    Statement of Jurisdiction...............................................................1

II.   Statement of the Issues..................................................................2

III.  Statement of the Case....................................................................3

    A.    Standards of Review  ...............................................................3

    B.    Procedural and Evidentiary Chronology ...............................4

        1.    Background ......................................................................4

        2.    The Claims ......................................................................5

        3.    Summary Judgment Rulings .........................................8

        4.    Pre-Trial Evidentiary Rulings....................................12

            A. Jeff Mroz and Carrie Amidon-Johansson, PhD. .....12

            B. Motions in Limine .................................................17

        5.    Trial Testimony and Evidence ....................................20

        6.    The Charges ..................................................................33

        7.    Closing Arguments ......................................................37

        8.    The Verdict....................................................................38

        9.    Post-Trial Motions .......................................................38

        10.   Order Denying Post-Trial Motions..............................39

IV.   Summary of the Argument ...........................................................45

V.    Argument ......................................................................................47

VI.   Conclusion ....................................................................................67

Certificate of Compliance.......................................................................69

Certificate of Service ..............................................................................70

# Table of Citations

**Page(s)**

**Cases:**

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) .................................................................. 48, 52

*Bonner v. City of Pritchard*,
  661 F.2d 1206 (11th Cir. 1981) ...................................................... 50

*Chmielewski v. City of St. Pete Beach*,
  890 F.3d 942 (11th Cir. 2018) ......................................................... 3

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) ......................................................... 3

*Dimick v. Schiedt*,
  293 U.S. 474 (1935) ...................................................................... 57

*Forster v. Smartstream, Inc.*,
  2016 WL 70605 (M.D. Fla. Jan. 6, 2016) ........................................ 52

*\*Freixa v. Prestige Cruise Services, LLC*,
  853 F. 3d 1344 (11th Cir. 2017) ........................ 14, 18, 47, 48, 51, 52

*Jenkins v. Anton*,
  922 F.3d 1257 (11th Cir. 2019) ...................................................... 48

*Klinedinst v. Swift Invs., Inc*,
  260 F.3d 1251 (11th Cir. 2001) ...................................................... 18

*Kotteakos v. United States*,
  328 U.S. 750 (1946) ................................................................... 4, 59

*Hornady v. Outokumpu Stainless USA, LLC*,
  572 F. Supp. 3d 1162 (S.D. Ala. 2021) ............................................. 4

iii

*In re: TMI Litig.*,
    193 F. 3d 613 (3d Cir. 1999)……………………………………….. 61

*McBride v. Carnival Corp.*,
    2024 WL 2484418 (11th Cir. May 24, 2024) …………………………57

*McGinnis v. Am. Home Mortgage Serv., Inc.*,
    817 F.3d 1241 (11th Cir. 2016) ……………………………………………… 3

*O'Neal v. McAninch*,
    513 U.S. 432 (1995) ………………………………………………… 3, 64

*Proctor v. Fluor Enterprises, Inc.*,
    494 F.3d 1337 (11th Cir. 2007) …………………………………… 3, 64

*Quick v City of Birmingham*,
    346 F, App'x 494 (11th Cir. 2019)………………………………… 40, 46

*Quiet Technology, DC-8, Inc. v. Hurel Dubois UK, Ltd.*,
    326 F. 3d 1333, (11th Cir. 2003) …………………………………………60

*Shinseki v. Sanders*,
    556 U.S. 396 (2009) ………………………………………………… 4, 59

*South v. U.S.*,
    368 F. 2d 202 (5th Cir. 1966) ……………………………………… 50

*Thompson v. Regions Sec. Servs., Inc.*,
    67 F.4th 1301 (11th Cir. 2023)……………………………………… 48

*U.S. v. Frazier*,
    387. F. 3d 1244 (11th Cir. 2004) ………………………… 4, 13, 56, 64

*U.S. v. Valdez*,
    2023 WL 355091 (11th Cir. Jan. 23, 2023)………………………… 18

*U.S. v. Williams*,
    865 F. 3d 1328 (11th Cir. 2017) …………………………………………56

*Walling v. Youngerman-Reynolds Hardwood Co.,*
    325 U.S. 419 (1945) ........................................................................ 48

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

28 U.S.C. § 1367 ................................................................................ 1

28 U.S.C. § 2111 ......................................................................... 3, 64

29 U.S.C. §§ 201, et seq. ................................................................... 1

29 U.S.C. § 207(a)(1) ...................................................................... 49

29 U.S.C. § 207(e) ............................................................................. 6

29 C.F.R. § 778.03 .......................................................................... 49

29 C.F.R. § 778.104 ........................................................ 13, 18, 48, 49

29. C.F.R. § 778.105 .................................................................. 13, 18

29 C.F.R. § 778.109(a) .................................................................... 52

29 C.F.R. § 778.115 ........................................................................ 14

29 C.F.R. § 778.119 ........................................................................ 52

29 C.F.R. § 778.210 ........................................................................ 57

29 C.F.R. § 785.48(b) ........................................................................ 9

Fed. R. Civ. P. 59 ....................................................................... 55-58

Fed. R. Evid. 401.................................................................. 18

Fed. R. Evid. 402.................................................................. 18

Fed. R. Evid. 403.................................................................. 18

 Fed. R. Evid. 701 ………………………………………………...16

*Eleventh Circuit *Pattern Jury Instruction 4.14* …………………………48

# I.    <u>Statement of Jurisdiction</u>

Bradly Gibson ("Gibson") sued Outokumpu Stainless USA, LLC ("OTK") alleging claims under Alabama common-law and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* (Docs. 1, 73) There is subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1367.

On February 14, 2024 the district court entered final judgment against OTK and in favor of Gibson for $3,545.17 based on a jury verdict in Gibson's favor on a *quantum meruit* claim and in OTK's favor on other claims including a $0 amount under the FLSA. (Doc.186) Gibson timely filed a notice of appeal on March 8, 2024. (Doc. 187) This Court has appellate jurisdiction. *See* 28 U.S.C. § 1291.

## II.    <u>Statement of the Issues</u>

The issues presented are:

1.    Did the district court abuse its discretion by denying a motion for new trial as to a $0 overtime amount that was unsupported by any evidence the jury could properly consider, and was contrary to all the evidence it was required to consider?

2.    When a district court identifies inadmissible evidence as possible support for a verdict, and then denies a motion for new trial citing that evidence, is it an abuse of discretion?

### III.   <u>Statement of the Case</u>

A.   <u>Standards of Review</u>.

A ruling on a motion for a new trial is reviewed for abuse of discretion. *McGinnis v. Am. Home Mortg. Serv., Inc.*, 817 F.3d 1241, 1255 (11th Cir. 2016) An Appellant is entitled to a new trial when a verdict is against the clear weight (or great weight) of the evidence or results in a miscarriage of justice. *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 948-949 (11th Cir. 2018)

If inadmissible evidence is the arguable evidentiary basis for the verdict, then additional review standards apply. The review of rulings that turn on interpreting Federal Rules of Evidence or controlling case law is plenary. *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F. 3d 548, 556 (11th Cir. 1998) Whether inadmissible evidence was admitted is reviewed for abuse of discretion. *Id.* Erroneous evidentiary rulings are a basis for reversal when they probably substantially influenced the verdict. *Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007); 28 U.S.C. § 2111. When there are "grave doubts" that evidentiary error had substantial, injurious effect or influence on a jury verdict then the error is not harmless and the appellant must win. *O'Neal v.*

*McAninch*, 513 U.S. 432, 437 (1995) Evaluating "harmful error" involves case-specific assessments based upon examination of the record and appellate courts are not "impregnable citadels of technicality." *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (quoting *Kotteakos v. United States,* 328 U.S. 750, 759, (1946)) Manifestly erroneous rulings on admitting expert testimony warrant reversal. *U.S. v. Frazier*, 387. F. 3d 1244, 1258 (11th Cir. 2004)

## B.    Procedural and Evidentiary Chronology.

The primary issue is whether the $0 FLSA damages award is against the clear weight of the evidence. The context to understand the reversible error encompasses the issues resolved in Gibson's favor at the summary judgment stage, pretrial evidentiary rulings that impacted the trial of the residual issues, the evidence at trial, and the jury charge.

### 1.    Background.

OTK employed Gibson from 2015 – February, 2021. In 2018 OTK was sued in a collective action for overlapping FLSA violations in *Hornady v. Outokumpu Stainless USA, LLC.* The procedural history of that case is set out at 572 F. Supp. 3d 1162 (S.D. Ala. 2021). Gibson did not opt into that collective. Gibson's employment ended on March 5, 2021

and he sued OTK for the same sort of claims as the *Hornady* plaintiffs. (Doc. 1) An Amended Complaint was filed June 16, 2022. (Doc. 73) The Answer to that was filed June 30, 2022. (Doc. 78) OTK stipulated that a three-year statute of limitations applied to the FLSA claims and that equal liquidated damages would be awarded for underpaid overtime. (Doc. 34, PageId. 193-194) This mooted any issue about the willfulness of OTK's FLSA violations.

2. <u>The Claims.</u>

Gibson sometimes worked extra shifts, but the baseline schedule was four 12-hour shifts in what OTK considered a workweek followed by three 12-hour shifts the next workweek. (See Doc. 137, PageId. 3667 "undisputed facts.")  Therefore, OTK paid overtime many weeks.

Gibson alleged overlapping FLSA violations.

There was a bonus claim described in paragraphs 41.1-42, 44 of the Amended Complaint. (See Doc. 73, PageId. 809-810) Substantial bonuses were awarded facility-wide to employees based on criteria over a calendar month (e.g. January 1 – 31). Those bonuses were paid at the end of the next month (e.g. February 28). Calculating the monetary amount of each

5

employee's lump sum bonus began with OTK announcing a percentage multiplier. The same multiplier was used for all employees.

That multiplier was not applied to the earnings for the calendar month the bonus was earned. (e.g. January 1-31) Instead, it was applied to the amount of the paychecks an employee happened to receive during that calendar month. Those paychecks covered 4 weeks, or 6 weeks, but they never matched the calendar month the bonus was earned. When it paid bonuses (e.g. on February 28), OTK did not allocate the amount to the weeks and partial weeks during the calendar month the bonus was earned and it did not recalculate additional amounts of overtime pay for those weeks and partial weeks (e.g. weeks during January). Gibson contended this violated 29 U.S.C. § 207(e). The legal basis for this position was detailed in Gibson's summary judgment filings. (Doc. 91, PageId. 1790-1795, Doc. 117, PageId. 3332-3339)

There was also an overtime "rounding" claim described in paragraphs 9-23, 44-45, 48.1, 48.2 of the Amended Complaint. (Doc.73) Gibson would clock-in before 6:00 and clock-out after 6:00 but OTK routinely rounded the time he was paid to 12 hours. Its policies discouraged employees from clocking in / out at any time that could be

rounded in their favor. Gibson alleged that he would make shift "relief" with the departing / arriving employee on the opposite shift right after he clocked in, and right before he clocked out.

For the rounded, unpaid time in weeks Gibson did not work more than 40 hours, Gibson asserted alternative "gap time" FLSA minimum wage claims and unjust enrichment / *quantum meruit* claims.[2] (Doc.73, paragraphs 55, 61-66)

There was also a "RROP" calculation claim described in paragraphs 24, 34, 37.1-37.6, 45. (Doc. 73) OTK paid $.50 / hour more for night-shift work. OTK used formulas to calculate overtime pay. Sometimes, the result was payments that were less than 1.5 X the rate Gibson actually worked for a week. This flowed from what OTK called a "RROP" calculation. An illustrative result was that if Gibson worked 48 hours at a night shift rate of $25.39, OTK paid for 8 hours of "shift OT" at a rate of $37.70 which is $.38 an hour less than 1.5 X $25.39. (See e.g. Doc. 160, PageId. 4173)

---

[2] Gibson consistently acknowledged that the common law claims could only be for rounded time in the weeks that the FLSA did not provide for an overtime claim. (See Doc. 171, PageId. 510-511)

Separately, Gibson alleged that OTK designated pay periods based on standard calendar week periods (e.g. Monday – Sunday, or Sunday – Saturday) but did not pay for overtime on that 168 hour basis. Gibson also alleged that OTK did not pay based on any 168 hour basis because OTK did not split shifts that crossed over two weeks into separate weeks. (Doc. 73, paragraphs 25-33)

Last, in *Hornady* OTK's Rule 30(b)(6) representative testified that every month OTK identified underpayments of overtime and then included in the first paycheck of the next month a "trued-up" amount to make up for that underpayment. Gibson alleged that these late payments violated the FLSA. (Doc. 73, paragraphs 36, 46, 58)

3.    <u>Summary Judgment Rulings</u>.

On March 22, 2023 the district court granted summary judgment to Gibson on three claims. (Doc. 123)

<u>Bonuses</u>: The district court recognized that – sometimes – delayed bonus payments do not require recalculating additional amounts of overtime pay but that OTK's bonuses did not meet the criteria for that treatment. (Doc.123, PageId. 3398-3399) The district court recognized that recalculation of additional amounts of overtime pay would always be

8

necessary if there was a temporal mis-alignment between the time period applied to the bonus calculation and the time period the bonuses were earned. (Doc. 123, PageId. 3401-3407)  The 4 or 6-week periods OTK used to calculate the bonus amount could never match the calendar month a bonus was earned. (Doc. 123, PageId. 3406-3407) But, OTK never recalculated additional overtime pay. The district court concluded that the "temporal disconnect" "flaunts the statutory premise" that sometimes allows percentage-based bonuses without additional recalculations. (Doc. 123, PageId. 3407)

Rounding: OTK did not dispute that its practices were non-neutral. The district court found that violated 29 C.F.R. § 785.48(b). OTK argued that summary judgment could not be granted because (a) whether Gibson performed compensable worked before / after the shift was a jury question, and (b) making shift relief was not compensable work. Those arguments were resolved in Gibson's favor in a section captioned: "**There is no Genuine Dispute of Fact as to Whether Plaintiff Performed Compensable Work during the Rounded off Time.**" (Doc. 123, PageId. 3416-3417) The district court also rejected OTK's arguments that

compensable work was *de minimis*, and that it could offset pay for meal breaks. (Doc. 123, PageId. 3417-3427)

RROP calculations: OTK did not dispute the showing that it improperly calculated the regular rate of pay. It admitted its calculations were based on two-week periods. The district court set out how Gibson was paid about $0.40 / an hour less than the required 1.5 X regular rate. OTK did argue it could offset payments for meal periods, and credit payments for one week against those due in another. Those arguments were rejected. (Doc. 123, PageId. 3435-3438)

Gibson did not seek summary judgment for particular amounts of overtime pay for particular weeks because what numbers to add, multiply and subtract depended on a determination of the applicable 168 hour week. On the factual issue of what the 168 hour pay week was, Gibson was denied summary judgment. (Doc. 123, PageId. 3431)

Even using a Sunday 6:00 a.m. cutoff time, OTK acknowledged that it did not split shifts (for pay purposes) that ran past that time. The district court decided that the "parameters of the workweek" was a fact issue to be resolved at trial and, until that was resolved, whether the split

shift / workweek practices actually resulted in an underpayment of overtime was indeterminable.[3] (Doc. 123, PageId. 3438 n. 13)

On the issue of whether OTK made undesignated, late "true-up" payments to make up for underpayments of overtime the district court identified disputed issues of material fact. (Doc. 123, PageId. 3438-3441)

The FLSA "gap time" claim was eliminated by summary judgment. (Doc. 123, PageId. 3443) The common law claims for rounded time in weeks the FLSA did not allow for an overtime claim remained for trial. (Doc. 123, PageId. 3450)

That left for a trial (a) when the 168 hour week began / ended, (b) the amount of underpaid overtime pay based on the specific 168 hour weekly periods the jury identified, (c) whether there were "true-up" payments, and (d) the common law claims.

What were not triable issues were (a) whether OTK paid recalculated additional overtime when it paid bonuses (it did not), (b) whether Gibson worked compensable time that got rounded down and was not paid for in weeks that he worked overtime (he did), and (c)

---

[3] Combining entire shifts for pay purposes would cause an underpayment of overtime if time that belonged in a week that Gibson worked more than 40 hours was attributed to a week that he worked less than 40 hours.

whether the RROP formulas resulted in underpayments of overtime some weeks (they did).

4. <u>Pre-Trial Evidentiary Rulings.</u>

*A. Jeff Mroz and Carrie Amidon - Johansson, PhD.*

Gibson retained a computer programmer (Jeff Mroz) to use OTK's data and calculate weekly overtime pay underpayments under various scenarios. OTK retained a labor economist named Carrie Amidon - Johansson ("Johansson"). In July 2022 Gibson and OTK filed motions to exclude testimony by Johansson and Mroz. (Docs. 95, 97)

Mroz was not expressing opinions. Mroz had written a computer application to perform the mathematical calculations of alternate damages based on different inputs. (See Doc. 104, PageId. 2880)  He would "testify about what the math is within fixed, recurring, 168 hour weeks." (Doc 104, PageId. 2882-2883)

As for Johansson, through the close of discovery, she did not prepare any calculations on an individual 168 hour week basis. She had disclaimed any opinions about what OTK did, and about how damages should or should not be calculated. (Doc. 97, PageId. 1995)

12

But, Johansson had stated in a disclosed report that OTK's workweek was Sunday 6:00 a.m. – Sunday 5:59 a.m. This was phrased as if it was a statement of fact, or an opinion about facts. Gibson set out how there was no underlying methodology. (Doc. 97, PageId. 1998) Gibson argued that "expert testimony" which "offers nothing more than what lawyers" could argue was inadmissible. (Doc. 97, PageId. 2000) (citing *U.S. v. Frazier*, 387. F. 3d at 1262-63) Gibson argued that specialized knowledge is not required to establish a workweek, or about how hours were calculated and paid for. (Doc. 97, PageId. 2001) Therefore, Gibson contended "expert" testimony by Johansson about what she thought OTK actually did could not assist the jury. (Doc. 97, PageId. 2001)

In its reply, OTK merely said she would testify to the same opinions that – in deposition – she had disclaimed. (Compare Doc. 105, PageId. 2894 to Doc. 93-2 1929-1930, Doc. 96-1, PageId. 1988-1990)

That left numbers and calculations. (Doc 97, PageId. 1996) Gibson set out that the calculations Johansson prepared were irrelevant and inadmissible because they were not based on 168-hour weekly periods. (Doc. 97, PageId. 2003-2006) Gibson cited 29 CFR §§ 778.104, 778.105,

778.115, and *Freixa v. Prestige Cruise Services, LLC*, 853 F. 3d 1344, 1348 (11th Cir. 2017)

In its reply, OTK did not dispute that at all. (Doc. 105)

Gibson then reiterated that calculations on any basis other than individual 168 hour weeks were irrelevant (therefore inadmissible), had no "weight" for a jury to assess, and that "expert" testimony about irrelevant calculations could not help a trier-of-fact. (Doc. 108, PageId. 2936-2939)

The *Daubert* motions were filed in July 2022. On April 26, 2023, OTK served what it called a "Supplemental Expert Report." (Doc. 140) Gibson supplemented his motion and attached the new report which included new calculations. (Doc. 146, 146-1)

Gibson stated his willingness to stipulate to two of the amounts stated by Johansson "as the baseline for damages under each of the two possible designations of" the applicable week but contended that the supplement did not otherwise change why she could not testify. (Doc. 146, PageId. 3869) The amounts Gibson offered to stipulate to were in the

last row of the 2nd and 3rd columns of Table 1 of the report.[4] (Doc. 146-1, PageId. 3881) Those were $12,978.31 (for weeks beginning Sunday 6:00 a.m.) and $19,766.93 (for weeks that tracked a calendar week). (Doc. 146-1, PageId. 3881)

At the *Daubert* hearing OTK called Johansson to testify. Johansson re-affirmed that the $12,978.31 amount was the total of weekly underpayments of overtime pay on a Sunday 6:00 a.m. – Sunday 5:59 a.m. basis (without subtracting or offsetting results from other weeks).[5] (Doc. 198, PageId. 6172-6173; Doc. 146-1)

Johansson reiterated that she would not offer expert opinion about how damages should (or should not) be calculated and testified that she

---

[4] OTK's counsel represented that the first two rows would not be the subject of any testimony. (Doc. 198, PageId. 6125, 6166-6167) A precise 168 hour week starting Sunday 6:00 a.m. was used in the 2nd column. (Doc. 146-1, PageId. 3881)

[5] Johansson testified that the 3rd and 4th rows in Table 1 showed three year totals but to get these totals she subtracted what she considered "overpayments" of overtime in some weeks from the underpayments of overtime in other weeks. Or, put differently, in those calculations she included "negative" amounts from some weeks to reduce the total. (Doc. 198, PageId. 6171-6172) The 5th row did not reduce weekly underpayments by results from other weeks because she used $0 rather than "negative" numbers for those weeks. (Doc. 198, PageId. 6172)

15

would not opine that Mroz made any math errors. (Doc. 198, PageId. 6149-6150)

Both Gibson's and OTK's motions were denied. (Doc. 154) The district court acknowledged that Mroz was not subject to *Daubert* analysis. Because he had personal knowledge of the calculations he performed, his testimony was admissible under Fed. R. Evid. 701. (Doc. 154, PageId. 4098)

Johansson was allowed to testify without limitation. The order recited how OTK's "records do not provide information such that Gibson's alleged damages are readily apparent." (Doc. 154, PageId. 4094) It recited that Johansson had calculated **a "range of underpayments**." (Doc. 154, PageId. 4095 (quoting OTK's own submission and Johansson's report, see Doc. 105, PageId. 2910) *Daubert* was not addressed about her calculations which were evaluated under Rule 701. (Doc. 154, PageId. 4099)

Whether she could testify as an expert about how OTK actually calculated pay for Gibson was separately evaluated (Doc. 154, PageId. 4099) Acknowledging that she had disclaimed opinions about OTK's workweek, the district court concluded that she could opine "that the

16

workweek OTK claims to have established aligns, as a matter of math, with OTK's employee records." (Doc. 154, PageId. 4103)

The district court rejected Gibson's argument that establishing a workweek, or how an employer counts hours or calculate pay, did not require specialized knowledge. The district court said testimony that the "workweek aligns with OTK's alleged workweek 'as a matter of math' is likely" beyond the understanding and experience of a layperson. (Doc. 154, PageId. 1403)

In response to Gibson's basic argument that calculations that were based on anything other than 168 hour weeks were irrelevant and inadmissible the district court viewed that as a matter of "credibility and weight" to be addressed on cross-examination. (Doc. 154 PageId. 4107)

B.    *Motions in Limine.*

Gibson also filed consolidated motions *in limine*. (Doc. 139) Some of that content about the irrelevance of evidence that was not tied to 168 hour periods overlapped with the testimony Johansson might give. Gibson sought to exclude evidence, testimony, or argument about:

- Overtime pay due on any basis other than a 168 hour week. (Doc. 139, PageId. 3713)

17

- Supposed overpayments making up for underpayments over time. (Doc. 139 PageId. 3714)

- Paid lunch breaks. (Doc. 139, PageId. 3715)

- How much Gibson was paid over any period other than a week, or a shift (for common law claims), or an hourly rate. (Doc. 139, PageId. 3715)

Gibson's motion cited to Fed. R. Evid. 401, 402, 403, 29 C.F.R. §§ 778.104 and 778.105, *Freixa* at 1346, *Klinedinst v. Swift Invs., Inc*, 260 F.3d 1251, 1256 (11th Cir. 2001), and the summary judgment rulings. (Doc. 139, PageId. 3714-3715)

Those four motions *in limine* were denied. (Doc. 150, PageId. 3960 paras. 1-4) To ensure a clear record, Gibson then filed alternative motions to reconsider and clarify. (Doc. 156, PageId. 4116) That filing cited *U.S. v. Valdez*, 2023 WL 355091 (11th Cir. Jan. 23, 2023) at *2-3. Gibson acknowledged that "a fair reading of the motions and the concise language: 'Denied' might not require reiterated objections at trial. OTK did not object to the requested clarification acknowledging a continuing objection. (Doc. 157) The motion was denied by oral order, and the continuing objection acknowledged. (Doc. 169, PageId. 4943) That

18

preserved Gibson's positions on the inadmissibility of testimony, evidence or argument about:

- Time worked, or payments made, for periods other than the specific 168 hour periods (and alternative periods) that Gibson claimed he was underpaid overtime.

- Bonuses - other than the amounts of each bonus allocated to the specific 168 hour periods (and alternative periods) that Gibson claimed he was underpaid overtime.

- Any sort of pre-payments, overpayments, credits, offsets, against amounts due for specific 168 hour periods of allegedly underpaid overtime based on any time or pay for anything other than the same specific 168 hour period (including "averages" and "evens out over time" subject matter).

- Overtime pay that was due on what OTK might consider a day, two-weeks, a month, a year, three years or any period other than the specific 168 hour periods (and alternative periods) that Gibson claimed he was underpaid overtime.

- Meal breaks.

(Doc. 156, PageId. 4116-4117)

19

5. <u>Trial Testimony and Evidence</u>.

There was no evidence that in any 168 hour week from beginning Sunday 6:00 a.m. that Gibson claimed he was underpaid for overtime he was, instead, paid at least 1.5 X a properly calculated regular rate of pay (including allocated later-paid bonuses) for all compensable time over 40 hours.

The evidence of the smallest amounts of separately totaled underpayments of weekly overtime with parameters of 168 hour weeks starting Sunday 6:00 a.m. were $8,488.01 (Mroz's calculations) and $12,044.00 (Johansson's calculation) (Doc. 161-8, PageId. 4372; Doc. 170, PageId. 5282; Doc. 172, PageId. 5654-5655, 5669)

At trial, the Earnings Statements were admitted.[6] (Doc. 169, PageId. 4959-4960, Docs. 160, 160-1) Ex. C covered the designated pay periods through January 27, 2019 (a Sunday). Ex. D began with the designated pay period ending February 9, 2019 (a Saturday). (Docs. 160, PageId. 4169, Doc. 160-1, PageId. 4170)

---

[6] Ex. L summarized the payments. (Doc. 161-2, PageId. 4307-4308)

Consistent with the discussion in the summary judgment order, the Earnings Statements that show a Monthly Bonus amount never show any corresponding allocation of that bonus to the weeks and partial weeks in which it was earned and never show any recalculation of additional overtime pay.[7]  (Docs. 160, 160-1)

The same exhibits illustrated that because Gibson's regular schedule consisted of alternating work-weeks of three 12-hour shifts (36 hours) and four 12 hour shifts (48 hours) he worked (and OTK paid him for) overtime hours during every calendar monthly period during which a bonus was earned. (Docs. 160, 160-1)[8]

The same exhibits showed that while OTK did not identify any amounts of overtime pay based on separate 168 hour weeks, it did distinguish between two different types of overtime: "Overtime" and "Shift OT Hrs." Some two-week Earnings Statements show both. (See e.g. Doc. 160, PageId. 4132, 4138, 4139, 4183 Doc. 160-1, PageId. 4209, 4212,

---

[7] Illustrative pages showing bonuses over the three year range are: Doc. 160, PageId. 4134, 4137, 4141, 4168, Doc. 160-1, PageId. 4171, 4174, 4178, 4201, 4239, 4244.

[8] See, as illustrative examples: Doc. 160, PageId. 4132, 4133, 4135, 4136, 4165, 4167, 4169, 4170, Doc. 160-1, PageId. 4203, 4208-4210, 4237, 4242.

4240) Others show one or the other. (See e.g. Doc. 160, PageId. 4133, 4135, Doc. 160-1, PageId. 4173, 4208, 4232, 4233) Even when Gibson's base rate did not change, the rates paid for "Overtime" and "Shift OT" varied. (As examples, compare Doc. 160, PageId. 4133, 4135, 4138)

The actual Excel time punches were in evidence as Ex. K. (See Doc. 161-1, PageId. 4305)

Ex. R showed Mroz's calculations of underpayments of overtime each 168 hour week using a Sunday 6:00 a.m. start time.[9] (Doc. 161-8, Doc. 170, PageId. 5281-5282) As illustration from May 13, 2018 (6:00 a.m.) – May 20 (6:00 a.m.) Gibson was clocked in for 48:30 hours and minutes. 8:30 is shown as overtime in Gibson's calculations. (Doc. 161-8, PageId. 4376) The Earnings Statement for the two-week period reflected that Gibson was paid for 85.25 hours over two-weeks and 8 hours of overtime. (Doc. 160, PageId. 4143) Gibson did not work more than 40 hours in the other week of that two-week period. (Doc. 161-5)  Therefore,

---

[9] Exs. P and Q had alternate calculations. (Docs. 161-6, 161-7) Those calculations were mooted by the jury's determinations about the designated 168 week and the trued-up claim.

Ex. R only included the May 13 – 20 week in the overtime underpayment calculations.[10]

When Mroz testified live (remotely), he explained how the computer application he wrote calculated underpayments for overtime. (Doc. 170, PageId. 5264-5267)  The weeks with more than 2400 minutes (40 hours) were identified. (Doc. 170, PageId. 5267) A blended pay rate was calculated accounting for the $.50 premium paid for time worked on night shifts. (Doc. 170, PageId. 5269-5270) Bonuses earned over a calendar month (and paid at the end of the next month) were divided by the hours actually worked during the month it was earned. (Doc. 170, PageId. 5270-5271) That allocated hourly amount was then included in the hourly rate for each 168 hour week that was multiplied by 1.5, and multiplied by the amount of overtime hours for the week to determine the amount due for overtime each 168 hour week. (Doc. 170, PageId. 5270-5272)

---

[10] Ex. O summarized the common law damages. (Doc. 161-5) The first part covered just the weeks after February 1, 2018 that Gibson was clocked-in for less than 40 hours. The total was $459.98. (Doc. 161-5, PageId. 4323-4328; Doc. 170, PageId. 5289)  Ex. O also included shift-by-shift calculations before February 1, 2018 (the period beyond the FLSA statute of limitations). It totaled $3,085.19. (Doc. 161-5, PageId. 4329-4343)

That amount could not be compared to readily identifiable amounts of overtime actually paid because OTK did not have that weekly information. (Doc. 170, PageId. 5272) Mroz explained how Ex. R used the amounts for two-week periods that OTK produced by applying the full amount OTK identified for two-weeks to any amount he calculated was due for overtime in a single week of a two-week pay period. If overtime was due in both weeks of the pay period, after the amount OTK paid for two-weeks was applied to one week any excess was applied to the other week of the same pay period. (Doc. 170, PageId. 5272-5273, 5281-5282, 5319-5325)

As an example, in the pay period associated with the June 8, 2018 pay period Gibson worked 20:31 hours overtime in one week and 8:22 hours overtime in the other week. (Doc. 161-8, PageId. 4376) The overtime Mroz calculated should have been paid in the first week was $901.21. It was $358.14 for the second week. (Doc. 161-8, PageId. 4376) OTK paid $1,042.72 of overtime for the two weeks. OTK did not allocate that total to one week periods. (Doc. 160, PageId. 4145) The result, in this example, was that there was no underpayment identified for the first

week and there was an underpayment of $216.63 attributed to the second week. (Doc. 161-8, PageId. 4376, last column "OT Underpayment")

The weekly overtime underpayment calculations in Ex. R totaled $8,488.01. (Doc. 161-8, PageId. 4372; Doc. 170, PageId. 5282)

For simplicity's sake, Gibson will generally discuss other parts of the trial testimony in the order it was presented.

Dave Scheid is OTK's Senior Vice President of HR. (Doc. 169, PageId. 5007) Scheid acknowledged that he understood that the district court had found that OTK had violated the FLSA through the bonuses, the rounding, and RROP calculations – this contradicted representations OTK's counsel had made in opening statements.[11] (Doc. 169, PageId. 5009-5010, 5045-5046)

Scheid confirmed that the way that OTK calculated overtime rates had "discrepancies" and that, sometimes, Gibson was paid less than he should have been paid. (Doc. 169, PageId. 5014-5015)  He acknowledged that he knew that ADP (OTK's payroll services provider) was incorrectly

---

[11] In OTK's opening statement its counsel had told the jury "it has not been decided that Outokumpu shorted Mr. Gibson overtime." (Doc. 169, PageId. 4989)  OTK's counsel also told the jury that Gibson's "theories" were "a shell game" including about the bonus. (Doc. 169, PageId. 4990)

averaging pay to determine overtime rates. (Doc. 169, PageId. 5021-5022) Scheid admitted that specific OTK records showed, for example, that Gibson was paid $0.38 less an hour than 1.5 X the rate he had worked at. (Doc. 169, PageId. 5039-5041)

Melissa Pledger is OTK's Senior HR specialist who processes payroll. (Doc. 169, PageId. 5072)  She did not know what formulas were actually used to calculate overtime. (Doc. 169, PageId. 5103-5104, 5113, 5116) She did, however, describe how OTK miscalculated overtime pay rates leading to the "discrepancies" Scheid had admitted to. If Gibson only worked at night during a week (at $24.81 / hour) Pledger said the overtime rate would be $24.31 X 1.5 with $0.50 added in at the end. (Doc. 169, PageId. 5117-5119) She testified that while 1.5 X $24.81 = $37.21 / hour what OTK would pay for overtime was $36.96 / hour. (Doc. 169, PageId. 5117-5119) Pledger testified about a series of specifically identified two-week pay periods and said she could not identify how much overtime was paid for each week. (Doc. 169, PageId. 5144-5155)

About rounding, she described how if Gibson clocked in before 6:00 OTK started paying at 6:00; if he clocked out after 6:00 OTK stopped paying at 6:00 (Doc. 169, PageId. 5120) She reiterated prior testimony

that OTK assumed employees work from the clock-in until clock-out. (Doc. 169, PageId. 5121-5122)

Gibson testified about how he would clock in, and then make shift relief and inspect the forklift he operated. (Doc. 170, PageId. 5352-5353) Walking from the clock to make relief took a little over a minute. (Doc. 170, PageId. 5353) He testified that he claimed he should be paid from clock-in to clock-out, but deferred to counsel about the details of other violations. (Doc. 170, PageId. 5370-5371)

Carlos Villacreces is OTK's Manager of Pay Structure and Compensation. (Doc. 171, PageId. 5382-5387) He confirmed how OTK rounded time, and how to calculate the common law claims for rounded time. (Doc. 171, PageId. 5397-5398) He did say that testimony assumed Gibson actually "worked during those – all times clocked in and clocked out." (Doc. 171, PageId. 5398) He did not offer any testimony to counter that assumption. Neither did anyone else.

OTK's counsel read to Villacreces the district court's order describing how the bonus payments violated the FLSA. Villacreces testified nothing was wrong with how the bonuses were paid. Then he

described how OTK's practices were exactly what the district court had described as the violation. (Doc. 171, PageId. 5440-5441)

Then, Villacreces agreed with OTK's counsel that he was "not in disagreement with the Court Order" and (again) described how the month the bonuses were earned and the pay periods used to calculate the bonus amount did not match up. (Doc. 171, PageId. 5478-5480) (Pledger also described how bonuses were earned over a monthly period rather than two-week, four-week, or six-week periods.)[12] (Doc. 169. PageId. 5151-5152)

Neither he, nor anyone else, testified that OTK ever recalculated regular rates of pay, or overtime pay due, when the bonuses were paid a month after they were earned. Exs. C and D reflected that there was never any recalculation of additional overtime pay. (Docs. 160, 160-1)

Villacreces was asked by OTK's counsel whether Mroz's calculations gave OTK a credit for "all the overtime that they had already paid." Twice, he answered yes. (Doc. 171, PageId. 5480-5481)

---

[12] After testifying (in response to questions from OTK's lawyer) that paying the bonus on a later check was "okay" Pledger admitted that she knew a court order described how the bonus plan violated the FLSA. She claimed to be ignorant of the specifics of the violations. (Doc. 170, PageId. 5218-5221)

As OTK's counsel was permitted to do under the district court's pre-trial rulings Villacreces was asked, again, to agree that Mroz had **not** carried forward overtime payments from one pay period to another pay period as a credit. The third time he was asked this, Villacreces agreed. (Doc. 171, PageId. 5483)

Marva Rodrigues is another of OTK's HR personnel. She testified she was unaware of anything OTK had done that had been held to violate the FLSA. (Doc. 171, PageId. 5580-5582) She did not testify about overtime pay to Gibson in any week that he worked 48 hours a week.

Rodrigues did testify, for example, about payments for time that Gibson **did not** work but that OTK called "vacation overtime" for the pay period ending December 2, 2018 (paydate December 7, 2018). (Doc. 171, PageId. 5568, referencing Doc. 160 PageId. 4164)  Gibson, however, did not work more than 40 hours in either weeks in that pay period. The Sunday 6:00 a.m. – Sunday 5:59 a.m. calculations Gibson presented did not identify any overtime underpayments for those weeks. (Doc. 161-8)

OTK then called Johansson. She recited her credentials and qualifications. (Doc. 172, PageId. 5611-5617) She testified about an (unspecified) Earnings Statement that – she said – did **not include** any

overtime. (Doc. 172, PageId. 5619-5621) She agreed with OTK's counsel that "the math matched" and that OTK used a Sunday 6:00 a.m. – Sunday 5:59 a.m. week to generate payments. (Doc. 172, PageId. 5623-5624)

Johansson then testified about Ex. P prepared by Mroz. (Doc. 172, PageId. 5628-5629, referencing Doc. 161-6) Ex. P had calculations based on a 168 hour week running Monday – Sunday until January 27, 2019 and then Sunday – Saturday. (Doc. 161-6) Johansson repeated what Mroz acknowledged – that the calculations he prepared did not credit overtime for any two-week pay period against amounts due for a different two-week period. (Doc. 172, PageId. 5630-5632). Johansson, however, used phrases like "fails to include the $300," "that $300 is now lost," "dropping off the overtime that was actually paid," and "failed to account for the overtime that was actually paid." (Doc. 172, PageId. 5630-5633)

Johansson testified that for every monthly bonus the calendar month did not match up with the two-week pay periods. (Doc. 172, PageId. 5638-5640) She further testified that OTK's bonus math did not work out "exactly the same" because of the difference between the period

30

the bonus was earned and the period of earnings used in calculating the ultimate bonus amount. (Doc. 172, PageId. 5640-5641)

Johansson's description of how Mroz did not attribute overtime pay across two-week pay periods was allowed under the orders denying Gibson's motions *in limine* and seeking to exclude Johansson's testimony. (Doc. 150, Doc. 169, PageId. 4943, Doc. 154, PageId. 4107) So was her testimony about aggregate amounts. Without identifying any time period, Johansson testified that Gibson was paid approximately $450 more using OTK's bonus method than "if they had actually done it on a calendar month and using what would have been determined as his calendar month earnings." (Doc. 172, PageId. 5641-5642) Johansson testified that (unspecified) weeks in Mroz's (unspecified) reports did not credit what she said were "overtime" payments in weeks that Gibson **did not** work more than 40 hours. (Doc. 172, PageId. 5642)

On direct examination, however, Johansson also testified that she calculated the number of minutes from clock-in to clock-out that had not been paid. (Doc. 172, PageId. 5644) This came to about $2,000 for rounded **overtime**. (Doc. 172, PageId. 5644-5645)

31

But, OTK did **not ask** Johansson on direct examination about **any** of the Table 1 weekly calculations that OTK had represented she would testify about.

On cross-examination Johansson was questioned about part of those Table 1 calculations. (The report was not admitted per OTK's objection). (Doc. 172, PageId. 5650-5653) She acknowledged a $12,044.00 underpayment amount she had calculated for the Sunday 6:00 a.m. – Sunday 5:59 a.m. weeks. (Doc. 172, PageId. 5654-5655) She elaborated that she had run other calculations including $18,993.11 to correspond to a Monday – Sunday, then Sunday – Saturday week. (Doc. 172, PageId. 5667-5668)

OTK then recalled Scheid. He provided no testimony about how much overtime OTK paid on any 168 hour weekly basis. Without identifying any time periods, he testified that he had reviewed whether Gibson was shorted on overtime and declared that he was not. (Doc. 172, PageId. 5691) He also testified that the bonus "was correct." (Doc. 172, PageId. 5691) The next question OTK's counsel asked was whether Scheid acknowledged that "**the bonus was not done correctly**?" Scheid answered "yes." (Doc. 172, PageId. 5691)  Without identifying any

dates or time periods he testified that he did not think employees were shorted overtime on the bonuses. (Doc. 172, PageId. 5691-5692) All of this was allowed under the court's motion *in limine* rulings.

6. <u>The Charges.</u>

OTK withdrew its proposed verdict form and during the charge conference the parties agreed on a variation of what Gibson had proposed. (Doc. 172, PageId. 5739-5741)

The charge to the jury begins at Doc. 170, PageID 5808. Bold text emphasis is added. It included standard charges such as: (a) a decision "must be based only on the evidence," (b) the jury "must" follow the law and could not disregard any of the instructions, (c) evidence included testimony and exhibits, but not anything the lawyers said, and (d) instructions to account for testimony of all witnesses, and to "attempt to reconcile all of the testimony so that all of the witnesses speak the truth if you can do so reasonably." (Doc. 172, PageId. 5808-5812)

The charge also summarized what the jury did "not have to decide." (Doc. 172, PageId. 5813)

> I have already found that the defendant violated the FLSA by how it calculated overtime pay, how it handled bonus payments and related overtime pay, and how -- and how time that was rounded was not paid for.

33

(Doc. 172, PageId. 5815-5816)

About bonuses:

> ... OTK's bonuses are remuneration -- that means money.
> They must be included in calculating Mr. Gibson's regular
> rate of pay. Those bonus amounts must be apportioned back
> over the workweeks of the period during which those were
> earned. Here, it has already been determined that the
> percentages that are part of OTK's bonuses are not paid tied
> to the wages earned during the bonus calculation period, and
> that is why they do not meet what the FLSA requires. The
> problem is not that OTK must pay the bonuses in the same
> month. **To comply with the FLSA, OTK had to
> recalculate the regular rate of pay to allocate the
> bonuses that were paid at the end of one month over
> the weeks and partial weeks that the bonus was earned
> and then recalculate the overtime pay that was due on
> a weekly basis, which was not done. Overtime pay must
> be recalculated at the revised regular rate**.

(Doc. 172, PageId. 5813-5814)

About rounding and meals:

> OTK's rounding policies: … and it has already been
> determined that this violates the FLSA. The defendant has
> records of when he clocked -- of when he clocked in and out....
> **Making relief is the sort of work that begins the time
> Mr. Gibson was entitled to have counted for overtime
> pay purposes.** Any meal breaks do not change or reduce
> what Mr. Gibson may be awarded under the FLSA.

(Doc. 172, PageId. 5814)

About RROP miscalculations:

34

You've heard about some RROP calculations that were made when work is done within a two-week pay period at different rates. Those two-week calculations of the pay rate violate the FLSA. **To comply with the FLSA, the pay rate must be calculated on a weekly basis. OTK has violated the FLSA in those three years.**

(Doc. 172, PageId. 5814-5815)

More generally, about damages:

It will still be up to you to decide how much, if anything, Mr. Gibson has shown he is entitled to recover under the FLSA.

. . .

The FLSA **requires** an employer to pay an employee at least one and one half times the employee's regular rate for time worked over 40 hours in a workweek. Put another way, if an employee works more than 40 hours in one workweek, the employer **must pay** that employee the overtime rate of 1.5 times the regular rate for **all** of the time worked after the first 40 hours. … An employee's regular rate for **one week** is the basis for calculating any overtime pay due the employee. In **a week** that more than 40 hours are worked, the regular rate for **the week** is determined by dividing the total wages paid for **the week**, without overtime pay, by the number of hours Mr. Gibson worked in the workweek.

To calculate how much overtime pay is owed to Mr. Gibson **for a certain week**, multiply the hours and minutes worked over 40 hours by the regular rate times 1.5.

OTK failed to pay Mr. Gibson if the required -- I'm sorry. OTK failed to pay Mr. Gibson the required pay if it paid him less than that amount in overtime pay for **the week**.

35

**The amount of damages is the difference between the amount Mr. Gibson should have been paid in overtime each week and the amount he was actually paid**.

(Doc. 172, PageId. 5816-5817)

An employer must total **all** of the hours worked by the employee in a pay week and **pay overtime for all time worked over 40 hours in a pay week**...

(Doc. 172, PageId. 5817)

Calculations **must** be made for compensation and hours for **each week individually. Employers cannot allocate overtime payments for one week against overtime pay due in another week."**

(Doc. 172, PageId. 5818)

The jury was charged that employers had to keep records "so that anyone" could "readily calculate" the wages per hour that are multiplied by 1.5 for overtime hours "**in a week**" and informed that when there are deficiencies in the records then employees can show "how much" they are entitled to by "just and reasonable inference from available information" even if the amounts were approximate. (Doc. 172, PageId. 5818)

The jury was also charged on the employer's potential burden to come "forward **with records**" to demonstrate the accounting methods it used and "to prove **the precise amount** of wages paid during a period that permits calculation of the hourly wage or hour" and that an employer

36

cannot use speculation as the basis for a credit against FLSA pay requirements. (Doc. 172, PageId. 5818-5819)

7. <u>Closing Arguments</u>

The jury was properly instructed that argument was not evidence. Therefore, Gibson will only mention a little of what was presented as argument. First, Gibson's counsel was explicit that the amounts in Ex. O for common law claims ($459 and $3,085.19) "don't fall under the Fair Labor Standards Act." (Doc. 172, PageId. 5782 referencing Ex. O, Doc. 161-5) This was consistent with Gibson's binding pre-trial representation that he sought $3,545.00 for common law damages. (Doc. 137, PageId. 3676)

Second, Gibson's counsel emphasized the 168 hour period that was supposed to be critical in determining whether overtime was owed. (Doc. 172, PageId. 5773-5775)

Third, OTK's counsel expressly argued about the same generic testimony its witnesses had offered that was untethered to any 168 hour periods. (See Doc. 172, PageId. 5786-5788) But, OTK's counsel also expressly referred to the $2,000 that Johannson had attributed to **overtime** (See Doc. 172, PageId. 5644-5645) and argued the jury should

"double that" but "put $4,000" in the "*quantum meruit*" claim. (Doc. 172, PageId. 5799-5800) Johansson's expertise was emphasized. (Doc. 172, PageId. 5786, 5793, 5795)

### 8. The Verdict.

The jury completed the agreed-upon verdict form. It resolved the fact issue about the 168 hour week designation as Sunday 6:00 a.m. – Sunday 5:59 a.m. It placed $0 as unpaid overtime. It found for OTK on the issue of late "trued up" overtime payments. It awarded $3,545.17 as common law damages for the *quantum meruit* claim. (Doc. 164)

### 9. Post-Trial Motions

Gibson filed a post-trial motion for new trial. (Doc. 166)  He set out the undisputed evidence that Gibson worked overtime many weeks, that the bonuses were never allocated back onto the regular rates for the weeks in which overtime has been paid and the bonuses were earned, that rounded time was not paid for at all in weeks that overtime was worked, and that the RROP formulas resulted in payments of overtime at rates that were less than 1.5 X regular rates in some weeks. (Doc. 166, PageId. 4924-4925, Doc. 181, PageId. 5921) Gibson set out how the

positive amounts associated with each of those unlawful acts on a 168 hour basis could not add up to $0. (Doc. 166, PageId. 4925)

Gibson argued that, over objection, OTK had been allowed to offer argument and testimony about overtime pay supposedly due over periods other than 168 hour weeks, about supposed overpayments that counted against underpayments, and about payments to Gibson over periods other than a week or a specific shift. Gibson pointed out that while OTK had offered that sort of evidence, it did not offer any evidence of weekly calculations of amounts due, and had not offered any evidence that Mroz's calculations were higher than any number OTK calculated. (Doc. 166, PageId. 4925-4926) Gibson pointed to Mroz's calculations, Johansson's testimony (about the $12,044 total when she did not subtract for supposed overpayments) and to OTK's time and pay records. (Doc. 181, PageId. 5923-5927)

10. Order Denying Post-Trial Motions.

Gibson's post-trial motion was denied. The order summarized the prior summary judgment rulings. It described the three claims that summary judgment was granted (rounding, bonuses, RROP calculations)

and stated that the trial as to those claims "was limited to damages." (Doc. 185, PageId. 5941)

It separately, accurately, referred to the "workweek violation" claim based on OTK's alleged failure to calculate wages on a fixed, recurring 168 hour week. (Doc. 185, PageId. 5941)  At the summary judgment stage, the district court ruled the "parameters of the workweek" was a fact issue for trial and understood that the designated week had to be decided as a predicate for whether there were related damages for that specific violation. (Doc. 123, PageId. 3438 n. 13)

The order accurately described the required Rule 59 analysis. A verdict could be upheld "so as long as there is some support" for it. (Doc. 185, PageId. 5943) (citing *Quick v City of Birmingham*, 346 F, App'x 494, 495 (11th Cir. 2019)) It also acknowledged that the standard to be applied was "more relaxed when evidentiary errors were made." (Doc. 185, PageId. 5943)

The order contained a section entitled "**The Great Weight of the Evidence.**" (Doc. 185, PageId. 5946)

The district court began its analysis by stating that the only evidence of "damages calculations" was presented by Mroz and Johansson. (Doc. 185, PageId. 5947)

It did not mention the testimony of OTK's witnesses about the actual underpayments based on RROP formulas. It did not mention OTK's witnesses' testimony that when it paid bonuses it did not recalculate and then pay any additional amounts (even though overtime had been worked during weeks within the months the bonuses were earned). It did not mention the testimony of OTK's witnesses who acknowledged that it rounded down (and did not pay for) time after Gibson made relief. (The jury was instructed this was compensable time). It did not mention Gibson's testimony that he would clock-in and promptly make relief. It did not address Mroz's testimony about his 168 hour based calculations for weeks beginning Sunday 6:00 a.m.

The only evidence the district court discussed was about Johansson. The district court provided several comments.

- In footnote 3 it stated that she had testified that "when the bonus claim was calculated in accordance with the summary judgment rulings" there were no damages. (citing Doc. 173

[sic] at 36 and PageId. 5642) The cited testimony at Doc. 172, PageId. 5642 was not tied to any particular weeks, or to a particular month. Also, what the district court cited to was not testimony about how to calculate damages in accord with the court rulings.  Instead, it was a comparison of what she claimed the amounts of the bonuses themselves would have been if they were calculated in a way that did not require recalculations of additional overtime (i.e. a bonus plan that complied with the FLSA without additional calculations). The testimony the district court cited to was unrelated to underpayments of overtime.

- The district court acknowledged that she had provided testimony about a "positive amount of damages" on the rounding claim but suggested the jury could have found that testimony unconvincing because it was on cross-examination after she testified "on direct as to other potential damages calculations."

- The district court also stated that the jury could have given little weight to her testimony about a $12,044 total "without

zeroing out negative calculations" in the face of her previous testimony. (Doc. 185, PageId. 5948)

- The district court stated that the jury could have "accredited the amount elicited on direct exam to Plaintiff's state law rounding claim." (Doc. 185, PageId. 5948) The only amount from her direct examination that Gibson had pointed to was the $2,000 Johansson had testified explicitly was "overtime." (Doc. 181, PageId. 5924 citing to Doc. 172, PageId. 5644-5645) The portions of OTK's submission the district court cited to do not say anything different.

The district court discussed that the agreed upon verdict form had a single line for damages. (Doc. 181, PageId. 5946) Section I of the Verdict form asked the jury to determine the designated week, and then "based on that week" to award unpaid overtime. (Doc. 164) As mentioned, the district court had previously recognized that whether OTK's failure to split shifts violated the FLSA depended on when the week started and ended (and therefore whether a splitting of the shift would be associated with additional overtime pay). (Doc.123, PageId. 3431)

The district court did not state, one way or the other, whether its evidentiary rulings were in error. It did say that the admission of evidence over Gibson's objection was not a substantial error warranting a new trial, and that if there was an error the court was not persuaded it was harmful - pointing to the jury charges and "the relevant records were submitted to the jury." (Doc. 185, PageId. 5950)

Judgment was then entered for $3,545.17 in favor of Gibson "on his *quantum meruit* claim." (Doc. 186)

# IV.   Summary of the Argument

As a matter of law, Gibson is entitled to a new trial as to the amount of damages caused by OTK's three violations of the FLSA. (Rounding, bonuses, RROP). Those damages are due to be calculated solely based on the amount that should have been paid each 168 hour week starting Sunday at 6:00 a.m. versus the amount actually paid each of those weeks. The jury should never have considered any other sort of evidence. The $0 result was impossible based on the evidence it could consider.

In evaluating the Rule 59 motion, the district court was required to look at exactly that same evidence.

A $0 result would depend on evidence that in **every** week Gibson worked overtime he was, in fact, (1) paid for all the time that was rounded after clocking in and making relief, and, (2) later, when bonuses were paid at the end of the next month, there was a recalculation and payment of additional amounts of overtime pay due, and (3) that the RROP miscalculations **never** resulted in payments of overtime at rates less than 1.5 X the regular rate. The exact opposite was established by uncontradicted evidence at trial, including the testimony of OTK's lay

witnesses and its records. That mirrored the undisputed facts leading to summary judgment, and it made a $0 result impossible.

This is the unusual case where there is no evidence to support a verdict. The trial court recognized that conclusion would dictate a new trial because a verdict has to have "some support." (Doc. 185, PageId. 5943) (citing *Quick v City of Birmingham*, 346 F, App'x 494, 495 (11th Cir. 2019))  Its analysis, however, does not describe any.

If there had been evidence that any (let alone all) three of the claims that summary judgment was granted on did not lead to any underpayments of overtime in any week on a 168 hour basis, summary judgment would never have been granted. The nature of the claims dictated that the violations caused underpayments of overtime within defined 168 hour weeks.

The trial court's Rule 59 review did not mention the undisputed evidence showing underpayments of overtime on a 168 hour basis using weeks starting Sunday at 6:00 a.m. Its limited discussion focused solely on Johansson's testimony. Its attempts to explain away the testimony Johansson gave that cannot be reconciled with the $0 result was speculation about how the jury weighed evidence. In some situations,

46

that sort of speculation might be unobjectionable. Here, the district court speculated that the jury disregarded testimony describing entitlement to overtime pay that it was required to consider because – the district court speculated - it conflicted with testimony **it was not allowed to consider** at all and which was only allowed over Gibson's objections.

The fact that the district court pointed to evidence the jury could not properly consider about damages as a basis to deny the Rule 59 motion is a powerful demonstration that its erroneous evidentiary rulings were, in fact, harmful. But, that is a secondary basis for reversal. The simplest reason is that there was no evidence the jury could properly consider to support the $0 result (and there was undisputed evidence of positive amounts). Therefore, the denial of the Rule 59 motion is reversible error.

## V.    <u>Argument</u>

Gibson ensured that his trial presentation of damages for the FLSA violations the district court had already recognized was based on each individual 168 hour week. Any other approach risked obvious reversible error. Authorities like *Freixa*, 853 F.3d 1344 (11th Cir. 2017) mirror the statutory emphasis on single week calculations.

47

OTK's records were insufficient. (See e.g. Doc. 154, PageId. 4094-4095) As a matter of law, Gibson could show damages by "just and reasonable inference" even if the numbers were approximate. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, (1946) OTK had less wiggle room. Once Gibson provided sufficient evidence of damages it was OTK's burden to produce "evidence of the precise amount of work performed" or evidence to negate the reasonableness of the inference drawn from Gibson's evidence. *Mt. Clemens*, at 687.

But, whatever margin for approximation the law gave, Gibson, he still had to show damages on a 168 hour week basis.

So did OTK.

A 168 hour week is one cornerstone for FLSA calculations. Another is a properly calculated regular rate which is "an actual fact" and not an "arbitrary label." *Walling v. Youngerman-Reynolds Hardwood Co.* 325 U.S. 419, 424 (1945); *Thompson v. Regions Sec. Servs., Inc.*, 67 F.4th 1301, 1305 (11th Cir. 2023) The parties' agreed upon jury charges reflected fundamental damages principles derived from this Circuit's *Pattern Jury Instruction* 4.14*, 29 C.F.R. 778.104, *Freixa*, at 1346, *Jenkins*

48

*v. Anton*, 922 F.3d 1257, 1269 (11th Cir. 2019), 29 U.S.C. § 207(a)(1); 29 C.F.R. §§ 778.03, 778.104

Gibson's evidentiary presentation showed the jury the amounts of money that had to be included in a properly calculated regular rate each 168 hour period. It showed how much time he was due to be paid for working each 168 hour period. The damages calculations he presented were amounts (conservatively applying the overtime payments OTK made for each two-week period in a way that favored OTK) that were attributed to the same 168 hour periods.

If Gibson had done anything different, he risked a directed verdict for failing to present evidence to meet his burden of proof as to FLSA damages. He presented the evidence the law required. He did not proffer as evidence content the law excluded from consideration as totally irrelevant.

OTK took the opposite approach. It did so because if the evidence (let alone argument) about damages was limited to what the jury could properly consider then the jury would just add up positive dollar amounts of underpayments for 168 hour periods. The total would be the FLSA verdict amount. OTK chose to offer evidence the jury could not properly

consider despite the fact that Gibson made, and preserved, appropriate objections. The admission of evidence with no probative value at all, but which focuses a jury's attention on its content is grounds for reversal. *South v. U.S.*, 368 F. 2d 202, 205 (5th Cir. 1966)[13]

At trial, OTK took full advantage of the evidentiary leeway the district court gave it in denying Gibson's motions *in limine* and allowing Johansson's testimony as an expert. Because it could not counter the admissible evidence that was supposed to be used to calculate damages, OTK directed the jury's attention to content with no probative value.

The total absence of evidence at trial to support a $0 overtime pay result was the natural corollary to the undisputed material facts that led to the pretrial findings that three of the ways OTK violated the FLSA resulted in weekly underpayments (the amount of which would vary depending on the exact week designated).

Ultimately, OTK got the benefit of a verdict. That benefit is temporary. The corresponding judgment cannot withstand appellate review.

---

[13] Decisions of the former Fifth Circuit rendered before the close of business September 30, 1981 are binding in this Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981)

Litigants have jury trial rights, but they do not have any right to a jury determination on the basis of inadmissible evidence that a judicial finder of fact could never consider. Exercising jury trial rights does not change what evidence that can be considered to quantify a judgment for underpayment of overtime pay under the FLSA. Absent an order granting a motion *in limine* like the one Gibson filed, OTK was free to **argue** for any verdict it sought, but **argument** is not **evidence**. It was only entitled to a verdict about FLSA damages for its established violations of the FLSA that was consistent with the evidence the jury could properly consider about FLSA damages. And it was not entitled to a judgment if the verdict was against the clear weight of the evidence that could properly be considered.

In *Freixa* this Court reversed a district court because it took an improper approach to calculating damages:

> A district court ordinarily may not allocate compensation or hours across multiple weeks. ... Instead, it must calculate both compensation and hours for each individual week …

*Freixa*, at 1346. Even as finder of fact a "district court may not allocate commissions earned in one month across weeks worked in other months."

*Freixa*, at 1347.[14]    The district court's denials of Gibson's motions *in limine* were an abuse of discretion because the evidence it allowed was entirely irrelevant. Having been allowed to hear irrelevant evidence, the jury still could not (properly) consider it. Neither could the trial court in denying a Rule 59 motion.

As reflected in the jury charges which echoed *Mt. Clemens* the jury had some leeway in determining the exact amount of FLSA damages within what it decided was a Sunday 6:00 a.m. – Sunday 5:59 a.m. week framework. That leeway did not encompass downward adjustments to a $0 result under the undisputed evidence – especially not for any cross-allocation of supposed overpayments from other weeks. It was charged that could not be considered.

Each of the three established violations could only lead to entitlement to more overtime pay than was actually paid for 168 hour

---

[14] *Freixa* quoted the "apportioned back over the workweeks of the period during which it was earned" language of 29 C.F.R. § 778.119. *Freixa*, at 1347. Section 778.109(a) has "may be said to have been earned" instead of "was earned" language. In this context that is a distinction without a relevant difference. Commissions are just a subset of retroactively calculated incentive bonuses. See *Forster v. Smartstream, Inc.*, 2016 WL 70605, at *2 (M.D. Fla. Jan. 6, 2016) (acknowledging the general interchangeability of "bonus" and "commission" terminology)

weeks that overtime was worked. Rounded time in weeks Gibson worked overtime was not paid for at all. The failure to calculate and pay **any** additional amount when the bonuses are later paid automatically results in an underpayment of overtime pay. (Because the underlying regular rate is never adjusted upwards.)  When OTK miscalculated overtime rates using RROP, it paid rates that were less than 1.5 the regular rate. Its witnesses admitted caused underpayments to Gibson.

Positive amounts plus positive amounts plus positive amounts cannot equal $0.

Because supposed "overpayments" in other weeks could not be properly subtracted, there was no way to take the evidence of positive amounts of underpayments in various weeks and subtract anything to result in $0.[15]

The jury could not (a) (properly) disregard Mroz's testimony about weekly calculations of underpayments on a Sunday 6:00 a.m. – Sunday

---

[15] "Overpayments" is a misnomer. The FLSA provides for **minimum** payments on a weekly basis. An employee paid $10 / hour for 30 hours a week is not "overpaid" even though that is more than $7.25 / hour. Nor is an employee who is paid "double time" for time worked over 40 hours in a week (rather than 1.5 X a regular rate) "overpaid" under the FLSA.

5:59.m. basis, (b) **and disregard** Johansson's testimony (who on cross-examination acknowledged a $12,044.00[16] total of her weekly calculations for the same 168 hour period), (c) **and disregard** the testimony of OTK's witnesses who described how the RROP calculations resulted in hourly payments for overtime that were less than 1.5 X the applicable rate for overtime for specific weeks, (d) **and disregard** OTK's Earnings Statements that showed the same underpayment, (e) **and disregard** the Earnings Statements that showed that bonuses were paid without any contemporaneous recalculation of additional overtime (f) **and disregard** the time records, Earnings Statements, and testimony

---

[16] The variation between the numbers Mroz calculated and the higher numbers that Johansson calculated may reflect the difference between Gibson's burden to show damages that could be approximate, and OTK's burden to make precise calculations because its records were inadequate. Because OTK did not have identifiable amounts of overtime it paid each week, Gibson had Mroz conservatively credit (or over-credit) what OTK designated as overtime pay made over two-weeks against amounts it should have paid in each one week of a two-week period. Johannsson may have calculated amounts paid for each week and then did not cross-credit them within two-week periods to come up with the $12,044 total. Because, on direct, OTK never had her identify any 168 hour weekly testimony, the $12,044 amount was extracted from her on cross-examination.

that showed that Gibson was not paid overtime at all for the rounded time that he clocked in and was involved in making shift relief.

There was no evidence the jury could counter-weigh about damages for any of those violations on a 168 hour weekly basis. There was testimony (allowed over objection) from OTK's witnesses claiming generally that there were no underpayments, or that there were supposed overpayments. But these pronouncements were either (supposedly) multi-year totals or entirely untethered to any identified period. Either way, it was not evidence the jury could consider in calculating FLSA damages, and it was evidence that was erroneously allowed by the denials of Gibson's motions *in limine* (and the *Daubert* motion).

Fed. R. Civ. P. 59 recognizes that sometimes a properly instructed jury will reach a verdict against the clear weight of the evidence. It recognizes that one reason this might happen is that some erroneous evidentiary rulings are not harmless. The evidentiary rules themselves recognize that evidence may be proffered that is irrelevant, and that admitted evidence may mislead or confuse a jury. About experts, this Court has recognized that there are unique risks that lay jurors will

assign "talismanic" importance to testimony given with a stamp of purported expertise. *U.S. v. Williams*, 865 F. 3d 1328, 1340, 11th Cir. 2017; *Frazier*, at 1263. Gibson highlighted that concern in the motion to exclude Johansson's testimony. (Doc. 97, PageId. 1966)  OTK's counsel demonstrated exactly why the concern was valid throughout trial, including closing arguments.

A different, hypothetical jury could hear the same evidence and argument as the actual *Gibson* jury, but adhere to the jury charge and then enter a monetary amount of FLSA damages on the verdict form.[17] In this hypothetical the admission of inadmissible testimony and allowance of improper argument would have been harmless error.

That is not what happened. Rule 59 is the tool that the Federal Rules provides to litigants in these situations. Gibson is peculiarly well-

---

[17] That amount would necessarily be an aggregate of the various violations because they were interdependent. The regular rate had to include the allocated bonus, but it also had to be used as the basis for all of the compensable overtime (including the rounded amount of overtime time that had not been paid), and then the RROP based underpayments could not be separately awarded without triggering a double recovery. The RROP underpayments got picked up, on a weekly basis, in Mroz's calculations when the amounts actually paid for overtime was compared to the overtime pay that was due.

suited to meet what Rule 59 requires because the FLSA is so precise about how overtime damages are calculated, and because the basis for his damages was clearly documented. That undisputed / indisputable evidence was the source of the summary judgment rulings. The reason the factual basis for summary judgment was undisputed is the same reason OTK could not offer any admissible evidence of a $0 result - - there was no such admissible evidence.

Either overtime is paid at a rate of at least 1.5 X the regular rate every week, or it is not. Either an employee is paid for all compensable time over 40 hours at that rate every week, or not. Either additional amounts of overtime pay are retroactively calculated and paid when a bonus (that does not comply with the FLSA's exemption in 29 C.F.R. § 778.210) is paid belatedly, or not.

In considering a Rule 59 motion the district court has to compare the weight of the properly considered evidence on both sides of the issue.[18]

---

[18] If this case was tried in a state court forum then a trial court would have the option of an additur to enter judgment in the amounts that either Mroz or Johansson had calculated. That is not an option in this federal forum. *Dimick v. Schiedt*, 293 U.S. 474 (1935); *McBride v. Carnival Corp.*, 2024 WL 2484418, at *1 n. 1 (11th Cir. May 24, 2024)

In doing so, the district court cannot disregard the testimony of witnesses, or the exhibits in evidence. In this case, in considering Gibson's motion the district court could not properly "weigh" as evidence in support of the verdict any testimony about supposed calculations which were not based on the relevant 168 hour periods. The district court's Rule 59 review had to be limited to the properly admitted relevant evidence as well.

When a trial court can identify some evidence that supports the verdict it makes for an easy ruling that the verdict was not against the clear weight of the evidence. That is not the situation here because – as described – there was no evidence that could support a $0 result. The district court's order did not identify any evidence that supported the $0 result.

In denying a new trial, the district court hypothesized about what a jury might have thought, but failed to address the controlling issue. No matter how the jury might sew together the testimony to quantify damages based on each 168 hour week that began Sunday at 6:00 a.m. there was no way to reach a $0 result. The witnesses described, and the records showed, underpayments in individual weeks. The jury was not

allowed to offset anything no matter what it thought happened in different weeks.

Evaluating "harmful error" involves case-specific assessments based upon examination of the record and appellate courts are not "impregnable citadels of technicality." *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (quoting *Kotteakos v. United States,* 328 U.S. 750, 759, (1946)) Gibson has just discussed the admissible evidence the jury could not disregard. Almost none of it was mentioned in the district court's order. The substantive discussion of the evidence was short, and focused entirely on Johansson. Going through that limited discussion only re-emphasizes why the denial of a new trial about damages for the three violations (using weeks that begin Sunday at 6:00 a.m.) was an abuse of discretion.

About Johansson, the district court provided several comments.

- In footnote 3 it stated that she had testified that "when the bonus claim was calculated in accordance with the summary judgment rulings" there were no damages. (citing Doc. 173 [sic] at 36 and PageId. 5642) **That was absolutely not the substance of the cited testimony**. The testimony at Doc. 172, PageId. 5642 was (a)

not tied to any particular weeks, or to a particular month, and (b) was a comparison of what she claimed the bonus amounts would have been if they were calculated differently than OTK actually calculated them. That testimony had nothing to do calculating weekly amounts due as overtime damages for the bonuses. In this instance the district court explicitly pointed to the sort of testimony that (a) was admitted over objection, and (b) that the jury was **not** allowed to consider under the jury charge.

- The district court acknowledged that Johansson had provided testimony about a "positive amount of damages" on the rounding claim. It said the jury could have found that unconvincing because it was on cross-examination after she testified "on direct as to other potential damages calculations." There is no adverse weighting of testimony on cross-examination.[19] More importantly, none of the

---

[19] In rejecting Gibson's pre-trial argument that her calculations based on anything other than 168 hour weeks were irrelevant and inadmissible the district court viewed that as a matter of "credibility and weight" to be addressed on cross-examination. (Doc. 154 PageId. 4107) As a matter of law, the only testimony she offered that was entitled to any weight was what she stated on cross-examination. Identifying flaws in generally reliable scientific evidence is the point of cross-examination. *Quiet Technology, DC-8, Inc. v. Hurel Dubois UK, Ltd.*, 326 F. 3d 1333, 1344 (11th Cir. 2003) But that adversarial testing process depends first on

testimony Johansson offered on direct was about calculations of overtime due on any 168 hour basis. Therefore, her direct examination testimony could not possibly be a legitimate basis to ignore her testimony about rounding damages for what she explicitly said was overtime pay. And, because the amounts Johansson did talk about on direct examination reflected inadmissible aggregate-type totals, the suggestion that such evidence led the jury to disregard her relevant testimony just emphasizes that the evidentiary errors were harmful.

- The district court also stated that the jury could have given little weight to Johansson's testimony about a $12,044 total "without zeroing out negative calculations" in the face of her previous testimony.(Doc. 185, PageId. 5948) Again, her previous testimony did not include anything about 168 hour calculations of overtime due. But again, there is a more obvious problem. The $12,044.00 amount did **not subtract** for overpayments in other weeks (which

---

there being "good grounds" for the testimony to begin with. *Quiet Technology*, at 1344, citing *In re: TMI Litig.*, 193 F. 3d 613, 692 (3d Cir. 1999)

she called negative calculations). The jury was charged that it could not allocate overtime payments for one week against overtime pay due in another (i.e subtract for overpayments). (Doc. 172, PageId. 5818) If the jury really did look to "any other [unspecified] damages calculations" as the court speculated as a basis to reject evidence it had to consider, and then relied on that evidence (admitted over objection) to subtract supposed weekly overpayments from underpayments, then there is no question the admission of that irrelevant evidence was harmful error.

- The district court stated that the jury could have "accredited the amount elicited on direct exam to Plaintiff's state law rounding claim." (Doc. 185, PageId. 5948) The only rounding amount from her direct examination that Gibson had pointed to was the $2,000 she had testified explicitly was "overtime." (Doc. 181, PageId. 5924 citing to Doc. 172, PageId. 5644-5645) The jury was not free to take testimony a witness said was about overtime pay and attribute it to claims for something else without some evidentiary basis to do so. The portions of OTK's submission the district court cited to do not say anything different.

The district court did not state, one way or the other, whether it made any error. It did say that the admission of evidence over Gibson's objection was not a substantial error warranting a new trial, and that if there was an error the court was not persuaded it was harmful. It pointed to the fact that the jury was properly instructed and "the relevant records were submitted to the jury." (Doc. 185, PageId. 5950)   The relevant records documented the basis for a positive jury award. The only contrary evidence the jury could have considered (if it disregarded the jury charge) was inadmissible evidence allowed over objection - such as the examples the district court itself identified as a basis to the jury could disregard evidence of damages.

The total absence of any admissible evidence to support a $0 result in line with the charges the jury was given makes this Court's appellate analysis of why it must reverse a simple one. That is unusual in a Rule 59 context. That should render the subsidiary analysis of whether the jury's verdict was contaminated by inadmissible evidence superfluous. But, the district court's own order denying the Rule 59 motion speculated that the basis for the jury's determination was the sort of evidence it had allowed over Gibson's objection. Erroneous evidentiary rulings are a

basis for reversal when they probably substantially influenced the verdict. *Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1352 (11th Cir. 2007); 28 U.S.C. § 2111. If there are "grave doubts" that evidentiary error had substantial, injurious effect or influence on a jury verdict then the error is not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995) That certainly applies here where even the limited explanations the district court offered for denying the motion for new trial cited to the sort of evidence that was admitted over Gibson's well-taken objection.

Separately, Gibson emphasizes that the jury should not have heard a word of Johansson's testimony except, perhaps, the two totals of overtime underpayments that corresponded exactly to the two possible 168 hour week periods and did not subtract for supposed "overpayments." Manifestly erroneous rulings on admitting expert testimony warrant reversal. *U.S. v. Frazier*, 387. F. 3d 1244, 1258 (11th Cir. 2004) To sneak through the *Daubert* gate she claimed to have no opinions about how damages should or should not be calculated. She claimed to opine that "math" would confirm that OTK had paid Gibson on a Sunday 6:00 a.m. – Sunday 5:59 a.m. basis.

How people get paid for working is one of the most basic experiences of a layperson. OTK's own HR personnel had that factual information. What those witnesses did not have, however, was the imprimatur of the letters "PhD." Allowing Johansson to testify as an "expert" was clear error and an abuse of discretion, and in closing OTK's counsel aggressively and repeatedly pushed the talismanic import of Johansson's PhD. Degree. The rationale for excluding evidence is not supposed to be an instructional manual for a party about how to use (or misuse) inadmissible evidence that is erroneously admitted.

Lay people (who often have jobs) are entirely capable of understanding factual testimony like "this company designated a week that starts Sunday at 6:00 a.m." They are equally capable of understanding fact testimony like "this company calculated hours and pay starting Sunday at 6:00 a.m. and ending the next Sunday 6:00 a.m. plus any time we did not round after Sunday 6:00 a.m. at the end of that 168 hours."

The error of allowing Johansson to testify as an expert was compounded by the district court allowing testimony (by all OTK's witnesses) about pay periods that were not limited to 168 hour weeks.

With that ruling, OTK's witnesses, including Johansson could say anything at all about any monetary amounts.[20]

OTK took full advantage of the error it lobbied for. Within the district court's rulings, OTK's lawyers and its witnesses could "criticize" Mroz's calculations for failing to credit overtime payments from one pay period against those due in another - even though the opposite approach was impermissible. Its witnesses could offer their own pronouncements that over (unspecified) times there were no underpayments. It is obvious the erroneous evidentiary rulings were not just error, but reversible harmful error.

It is significant that the jury awarded common law damages for rounded time in the exact amount Gibson set out for the weeks that were not covered by the FLSA, but awarded nothing for the same sort of time in the weeks that overtime was due under the FLSA. Given how clear the charges were, the outcome is attributable either to (a) OTK's counsel's

---

[20] Johansson was only able to present a comparison (and implied critique) of Mroz for **not** cross-crediting payments across pay periods (let alone individual weeks) because Gibson's motion *in limine* that would have limited all evidence to weekly numbers (except the common-law claims which were shift based) was improperly denied.

direct appeal to the jury to apply the $2,000 Johansson testified about for rounded overtime and just allocate it to the common law claims, and / or (b) OTK's witnesses' inadmissible proclamations that nothing was unpaid or underpaid which were not tied to any weekly periods. Whether the jury looked to argument as if it were evidence, or looked to testimony it was charged not to consider, the reversible result is the same and it was abuse of discretion to deny the Rule 59 motion.

## VI. Conclusion

There is no evidence that supports the $0 result. The district court's evidentiary rulings directly violated the most basic rule of evidence that irrelevant evidence is not admissible. Separately, Johansson was allowed to testify about irrelevant matters as an "expert" even though the subject matter of her testimony (other than complicated calculations) was nothing a layperson was not entirely capable of understanding.

It is very clear that the denial of a motion for new trial was an abuse of discretion, and Gibson respectfully submits it must be reversed.

June 20, 2024.

Respectfully submitted,

By:   /s/ Ian D. Rosenthal
Ian D. Rosenthal

DAVIS, DAVIS & ASSOCIATES
Ian D. Rosenthal
27180 Pollard Road
Daphne, Alabama 36526
(251) 621-1555
ian@ddalawfirm.com

MCDOWELL KNIGHT ROEDDER
      & SLEDGE, LLC
Frederick G. Helmsing, Jr.
11 North Water Street, Suite 13290
Mobile, Alabama 36602
(251) 432-5300
fhelmsing@mcdowellknight.com

SIMS LAW FIRM, LLC
Patrick H. Sims
P.O. Box 7112
Mobile, AL 36670
(251) 490-9424
Patrick@simslawfirm.net

*Counsel for Bradly Gibson*

---

No. 24-10714-J

*Bradly Gibson v. Outokumpu Stainless USA, LLC*

---

**CERTIFICATE OF COMPLIANCE WITH RULE 32**

This submission complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in 14-point Century Schoolbook, which is a proportionally spaced font that includes serifs.

The foregoing complies with the word limitations in Federal Rule of Appellate Procedure 32(a)(7) and contains 12,983 words excluding the parts of the submission that are exempt under Federal Rule Appellate Procedure 32(f).

/s/ *Ian D. Rosenthal*
OF COUNSEL

Dated:  June 20, 2024.

69

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2024, I electronically filed the foregoing document using the CM/ECF system for filing which will send notification of such filing to the following:


**Devin C. Dolive, Esq.**
Burr & Forman, LLP
420 North 20th Street – Suite 3400
Birmingham, Alabama 32503
ddolive@burr.com

**Cheri Turnage Gatlin, Esq.**
Burr & Forman, LLP
190 East Capitol Street, Ste M – 100
Jackson, MS 39201
cgatlin@burr.com


*/s/ Ian D. Rosenthal*
COUNSEL

70